IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| LUAIPOU FUTI, Individually and as Personal Representative of the Estate of Michael Tony Futi, deceased, and TONI FUTI, <br><br> Plaintiffs, <br><br> vs. <br><br> UNITED STATES OF AMERICA, <br><br> Defendant. | CIVIL NO. 08-00403 JMS/LEK <br><br> FINDINGS OF FACT AND CONCLUSIONS OF LAW |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**I. INTRODUCTION**

On January 12, 2010, the parties stipulated, and the court agreed, to alternative trial procedures in which Plaintiffs Luaipou Futi ("Mrs. Futi"), as personal representative of the estate of Michael Futi ("Michael"), and her husband Toni Futi (collectively "Plaintiffs") waived the right to a bench trial and the parties would submit trial briefs, exhibits, and proposed findings and conclusions. Doc. No. 90. Pursuant to the Stipulation, the parties agreed that the following evidence could be offered without evidentiary objection: (1) all expert reports and depositions; (2) all deposition exhibits marked in the case; (3) all Honolulu International Airport scene photographs provided by the United States during

discovery; (4) all traffic camera footage exchanged by the parties during discovery; and (5) the federal employee witness statements or affidavits found at USA Bates Nos. 0421-0428, 0673-676, and 0678-0680.  The Stipulation further required that all evidentiary objections that were not expressly waived in the Stipulation, including those relating to hearsay and authenticity, were to be raised in a separate "Statement of Evidentiary Objections" filed by February 22, 2010.  All objections not so raised were deemed waived by the parties.

Pursuant to the Stipulation, on January 25, 2010, Plaintiffs submitted their Opening Trial Brief.  On January 29, 2010, the parties submitted Joint Stipulation of Facts ("JSF") and Joint Stipulated Exhibits ("JSE").  On February 8, 2010, Defendant United States submitted its Trial Brief, and on February 16, 2010, Plaintiffs submitted their Final Trial Brief.  On February 22, 2010, the parties submitted proposed findings and conclusions, and the United States filed evidentiary objections.  On March 18, 2010, Plaintiffs responded to the United States' evidentiary objections.[1]  Argument on the issue of the discretionary function exception was heard on June 1, 2010.  After a status conference on June 16, 2010, Plaintiffs submitted an Opening Trial Brief on Causation on June 30,

---

[1]  The court rules herein on the United States' evidentiary objections only to the extent necessary to make its Findings of Fact and Conclusions of Law.

2010.  The United States submitted a Responsive Brief on July 7, 2010, and Plaintiffs submitted a Reply on July 12, 2010.

Pursuant to Federal Rule of Civil Procedure 52(a), the following constitute the court's Findings of Fact ("Findings") and Conclusions of Law ("Conclusions").  To the extent any Findings as stated may also be deemed to be Conclusions, they shall also be considered Conclusions.  Similarly, to the extent any Conclusions as stated may be deemed to be Findings, they shall also be considered Findings.  *See In re Bubble Up Delaware, Inc.*, 684 F.2d 1259, 1262 (9th Cir. 1982).

## II. <u>OVERVIEW</u>

On February 8, 2008, Michael, fifteen days old, passed away at the Honolulu Airport while his mother, Mrs. Futi, was waiting to complete customs screening.  Mrs. Futi and Michael had traveled from America Samoa with nurse Arizona Veavea ("Nurse Veavea") (collectively, the "Futi Party"), so that Michael could receive medical treatment for a heart murmur at Kapiolani Medical Center for Women and Children ("Kapiolani").  Plaintiffs assert that the U.S. Customs and Border Protection ("CBP") was negligent in its handling of Michael's medical information and screening of the Futi Party, causing Michael's death.

On September 8, 2008, Plaintiffs brought this action against the United States pursuant to the Federal Torts Claim Act ("FTCA"), 28 U.S.C. § 2671 *et seq*., to recover damages for Michael's death.  For the reasons set forth below, the court finds that Plaintiffs did not prove by a preponderance of evidence that the United States is liable for any negligence.

### III.  FINDINGS OF FACT

**A.    Michael's Birth and Medical Care in American Samoa**

1.    Michael was born on January 25, 2008, at LBJ Tropical Medical Center ("LBJ") in Pago Pago, in the U.S. Territory of American Samoa. JSF ¶ 1.

2.    A few days after his birth, LBJ doctors noted evidence of cardiomegaly (abnormal enlargement of the heart) and arrived at a clinical diagnosis of possible cyanotic congenital heart disease.  They were unable, however, to reach a definitive diagnosis or prognosis for Michael because they lacked sufficient medical resources in American Samoa.  *Id.* ¶ 4.

3.    Because they were not able to definitively diagnose Michael's condition, the LBJ physicians decided it was necessary to transfer Michael to Kapiolani in Honolulu for further cardiac evaluation and treatment, including possible heart surgery.  *Id.* ¶ 8.

4.      Around this time, Michael was placed on supplemental oxygen, which he remained on for almost the entire time he was at LBJ.  *Id.* ¶ 6.

**B.      Arrangements for Travel to the United States**

5.      Michael was a U.S. national based on his place of birth.  U.S. nationals, like U.S. citizens, may travel freely from American Samoa to the United States, and may stay as long as they desire.  *Id.* ¶ 2.

6.      In comparison, Mrs. Futi is from Western Samoa and is not a U.S. citizen or U.S. national, despite living in American Samoa.  Non U.S. nationals/citizens from Western Samoa, such as Mrs. Futi, must ordinarily possess a valid visa before they are even allowed to board an airplane bound for the United States.  *Id.* ¶ 3.

7.      Obtaining a visa may take up to six weeks.  *See* Def.'s Ex. MM, Bruce Tornquist Apr. 3, 2009 Depo. at 46:25-48:6.  Because Mrs. Futi did not have a visa to enter the United States, Jane Neru, the Chief Program Coordinator for the Off-Island Referral Program at LBJ, prepared and faxed to CBP an "emergency" visa/parole waiver request for Mrs. Futi to accompany Michael to the United States.  JSF ¶¶ 9, 11.

8.      Neru's facsimile, confirmed received on February 6, 2008, stated:

> The American Samoa Government and the LBJ Tropical
> Medical Center are requesting an "emergency"
> visa/parole waiver for Mrs. Futi, Luaipou to accompany
> her ill baby to Kapiolani Children Hospital for urgent
> medical treatment that are not available at the LBJ
> Hospital.
> 1.  Mrs. Futi has to accompany her 10 day old baby,
> male, to Kapiolani Hospital for treatment of heart
> murmur. . . .  Procedures of echocardiogram and medical
> or surgical management are expected which are not
> available at the LBJ Hospital. . . .  There will be a
> medical escort to travel with mother & baby to monitor
> oxygen for the patient.  They are confirmed to leave
> American Samoa on Thursday, 07 February 2008, on
> Hawaiian Airline Flt. 466 at 11:30 pm and to arrive
> Honolulu at approximately 0530 on 08 February 2008.

JSF ¶ 11; JSE 8.

9.     The request also included a one-page letter summarizing

Michael's condition as of January 29, 2008, which was prepared by one of the LBJ

pediatricians who treated Michael.  JSF ¶ 12; JSE Ex. 8.

10.     CBP relies on the accuracy of any medical information

provided in support of visa/parole waiver requests because the requests are

reviewed by CBP law enforcement officers, not medical professionals.  JSF ¶ 14.

11.     CBP has discretion in deciding whether to waive immigration

documentation requirements, such as a visa, and in deciding whether to grant a

pre-arrival visa/parole waiver.  *Id.* ¶ 13.  With that said, however, CBP does not

question a medical assessment provided by a medical professional and will afford

whatever inspectional accommodations are specifically requested.  *See* JSE 52 at 0447-48; *see also* Pls.' Ex. U, Allen Joe Sept. 9, 2009 Depo. at 12:21-24 (agreeing with certain statements in Sawyer Affidavit on behalf of the United States).

12. CBP Officer Bruce Tornquist reviewed the visa waiver request. The waiver request included a lot of "doctor speak" which suggested to Officer Tornquist that Michael was in critical need of attention.  Pls.' Ex. C at 513-14. Tornquist noted, however, that the request did not seek immediate clearance upon arrival and it was not for him to determine the urgency of Michael's medical circumstances.  *Id.* at 514.  Officer Tornquist explained that he is not in the habit of second guessing a physician's request and does not have the skills to make any conclusion regarding Michael's condition.  Def.'s Ex. MM, Tornquist Depo. at 55:18-56:18, 57:19-24.  Indeed, nothing in the information in the visa waiver request form indicated that Michael was critically ill.  JSE Ex. 62 at 5.

13. CBP approved Neru's request for a visa waiver because CBP's background check on Mrs. Futi did not uncover any derogatory information, and the request contained adequate documentation including Mrs. Futi's identification, a statement that Mrs. Futi would be accompanying her infant son to Honolulu for medical care that was not available in American Samoa, and medical information generally describing Michael's condition.  JSF ¶¶ 10, 15.

7

14.     On February 7, 2008, CBP sent a facsimile message back to LBJ and to Hawaiian Airlines granting the visa waiver request.  The pre-printed "CBP Form 3" read in the pre-printed portion: "Your request for consideration of a single-entry waiver for the following individual(s) has been approved for the time specified below:"  Under that text, a handwritten statement provides, "Luaipou Futi may travel and stay for duration of sons [sic] treatment."  *Id.* ¶ 16; JSE 11.

15.     Beyond explaining that Mrs. Futi must "present a valid passport that expires a minimum of 6-months beyond their period of authorized stay," the response did not describe the inspection process for Mrs. Futi at CBP. JSE 11.

16.     A CBP priority is to protect the health of arriving passengers -- adjustment or deferral of inspection procedures is frequently approved upon request by medical professionals or passengers when there is an immediate need for medical treatment, or an emergency arises.  JSF ¶ 37.

17.     For example, if CBP is notified that an arriving passenger has a medical emergency while on a plane en route to Honolulu Airport and requires ambulance plane-side transportation, CBP conducts its inspection plane-side and allows the passenger to depart by ambulance without ever entering the inspection building.  If the passenger needs to be transported immediately to the hospital by ambulance and cannot wait for a plane-side inspection, CBP allows the passenger

to enter the United States without completion of inspection procedures and completes the inspection at a later time, including at the hospital.  *Id.* ¶ 38.

18.    Jeffrey Sawyer, Assistant Port Director for Passenger Processing for CBP Honolulu, further testified that "[w]henever an emergency condition is brought to the attention of any CBP employee . . .  past practices and common sense dictate that obtaining immediate emergency assistance takes precedence over all other CBP activities and every effort must be made to render assistance."  JSE 52, Jeffrey Sawyer Feb. 21, 2008 Aff. at 0462; *see also* Pls.' Ex. U, Allen Joe Sept. 9, 2009 Depo. at 12:21-24 (agreeing with certain statements in Sawyer Affidavit on behalf of the United States).

19.    CBP did not make special arrangements to expedite the inspection process of Mrs. Futi because no such request was made.  *See* Pls.' Ex. F, George Minamishin Apr. 3, 2009 Depo. at 76:2-21, 77:5-20, 88:7-89:4; *see also* Pls.' Ex. E, Jane Neru Apr. 13, 2009 Depo. at 47:13-48:6 (stating that she could not request expedited processing).

20.    Neru did not arrange for an ambulance to take Michael to Kapiolani.  "[P]er the attending physician, the baby was doing well" and an ambulance was not needed.  Pls.' Ex. E, Neru Depo. at 48:16-49:3; *see also* JSF

¶ 26.  Dr. Alina Saldarriaga, an LBJ doctor who later took over as Michael's attending physician, stated, however, that LBJ had agreed on arranging for an ambulance to meet the Futi Party at the airport, but not the plane.  *See* Pls.' Ex. P, Alina Saldarriaga July 10, 2009 Depo. at 28:4-7.  Ultimately, no ambulance was arranged -- the LBJ "Physician's Request For Off-Island Referral" form prepared for Michael indicated that an ambulance was not required.  JSF ¶ 25.

21.    LBJ did make arrangements, however, for Nurse Veavea to accompany Michael and Mrs. Futi on the flight to Honolulu.  *Id.* ¶ 21.  Dr. Saldarriaga testified that she instructed Nurse Veavea to have supplemental oxygen available for Michael both in flight and on the ground for the duration of the trip to Honolulu.  *Id.* ¶ 22.

22.    Dr. Saldarriaga also completed written instructions on a "MedAire" form that supplemental oxygen was to be provided to Michael both in flight and on the ground en route to Kapiolani.  *Id.* ¶ 23.

## C.    The Flight from Pago Pago to Honolulu

23.    On February 7, 2008, Michael, Mrs. Futi, and Nurse Veavea pre-boarded Hawaiian Airlines flight 466 bound non-stop for Honolulu.  *Id.* ¶ 30.

24.    Prior to boarding the flight, Mrs. Futi checked one piece of luggage with Hawaiian Airlines.  *Id.* ¶ 31.

25.     Georgia Apana was the lead or first flight attendant for Hawaiian Airlines flight 466 on February 7, 2008.  Deirdre Nakama was the second or lead coach flight attendant, and she was primarily responsible for the area in which Mrs. Futi and Nurse Veavea sat with Michael.  Carol Lamse was a flight attendant in the coach cabin with Ms. Nakama.  *Id.* ¶ 33.

26.     During the flight, Michael received lasix and morphine intravenously from Nurse Veavea.  *Id.* ¶ 34.  Michael also received supplemental oxygen from two canisters, which LBJ had pre-ordered for the flight from Hawaiian Airlines.  *Id.* ¶ 32.

27.     Michael was stable throughout the flight, showing no signs of distress.  Pls.' Ex. G, Arizona Veavea Apr. 15, 2009 Depo. at 76:20-22; *see also* JSF ¶ 35.

28.     Nurse Veavea testified that during the flight, she asked a flight attendant if there was an ambulance waiting for them.  When the flight attendant told her no, Nurse Veavea was granted permission to deplane first.  Pls.' Ex. G, Veavea Depo. at 77:3-10; *see also* JSF ¶ 40.

**D.     Deplaning and Customs**

29.     The flight arrived in Honolulu at 5:32 a.m. local time on February 8, 2008.  JSF ¶ 39.  Ryan Otani, Hawaiian Airlines customer service

11

manager, testified that the plane's "block time" -- the time the exit doors of the

plane are opened -- was 5:32 a.m., and the Futi Party were the first people off the

plane.  Pls.' Ex. I, Ryan Otani May 11, 2009 Depo. at 13:3-8, 18:1-18.

Accordingly, the court finds that the Futi Party left the plane at approximately 5:32

a.m.

   30. Luggage began arriving on the baggage carousel at 5:58 a.m.

Pls.' Ex. N, Sawyer Depo. at 81:3-11.

   31. The Futi Party deplaned with Michael without any

supplemental oxygen.[2]  JSF ¶¶ 36, 40.  Nurse Veavea expected that they could get

---

[2]  Apana testified that Lamse requested, and Apana approved, that Lamse could offer for Nurse Veavea to take the oxygen cannister with her to customs.  Def.'s Ex. PP, Georgia Apana May 11, 2009 Depo. at 24:21-26:11.  Apana further testified that when she saw the Futi Party disembark, she asked Nurse Veavea why they did not have the oxygen cannister, to which Nurse Veavea responded that she did not need it.  Id. at 29:19-31:1.  In contrast, Lamse testified that she discussed the oxygen cannister with Apana, but that they concluded that the cannister could not leave the plane.  See Pls.' Ex. T, Carol Lamse May 11, 2009 Depo. at 17:9-18:16.  Nurse Veavea similarly testified that she did not remember any of the flight attendants offering her oxygen to take off the plane and that if she knew she could have taken the canister, she would have.  Pls.' Ex. G, Veavea Depo. at 81:16-82:18.  Because whether Nurse Veavea was actually offered oxygen to take with her through customs does not change the court's analysis, the court need not resolve this factual dispute.

 The United States objects to Plaintiffs' incomplete citations to Apana's deposition testimony and Plaintiffs' inclusion of full deposition transcripts on the record.  Doc. No. 100, Obj. Nos. 1, 9.  The court deems moot the first objection because the United States provided citations to Apana's testimony it believes is relevant.  As for the second objection, Plaintiffs do not oppose and the court therefore sustains this objection.

through customs and to Kapiolani without oxygen.  Pls.' Ex. G, Veavea Depo. at 82:19-22.[3]

32.     Nurse Veavea testified that while they deplaned, the IV line was still attached to Michael, and that Mrs. Futi carried Michael while Nurse Veavea carried the IV bag above his foot.  The IV bag was a 500 cc bag approximately 4 square inches (four inches by four inches).  Pls.' Ex. G, Veavea Depo. at 86:13-88:13; *see* also Pls.' Ex. M, Luaipou Futi Apr. 16, 2009 Depo. at 19:7-20:17.  This testimony is corroborated by the paramedics who later responded to the 911 calls to assist with Michael's medical emergency.  The Incident Detail Report provides that Michael had a "patent IV of D5 fluid running at TKO rate to the left foot, established prior to flight in Samoa."  Pls.' Ex. L at 5.

33.     In comparison, several CBP officers and others who later interacted with the Futi Party did not recall seeing an IV line and bag.  *See* Pls.' Exs. B, Cindy Lee Gillis Mar. 31, 2009 Depo. at 68:15-69:18, K, Stanley Gillis Mar. 31, 2009 Depo. at 46:23-47:18; Def.'s Exs. MM, Tornquist Depo. at 66:6-11,

---

[3]  Nurse Veavea provided inconsistent statements regarding how long she believed Michael could be without supplemental oxygen.  One day after the incident, Nurse Veavea told HPD Detective Randall Nakamura that she believed Michael could survive "an hour or so" without supplemental oxygen.  *See* Def.'s Ex. GG at 446:3-14.  During her deposition, however, Nurse Veavea testified that although she believed that they could get through customs and to Kapiolani without supplemental oxygen, she did not have an understanding of how long Michael could be without oxygen.  *See* Pls.' Ex. G, Veavea Depo. at 169:2-13.

66:24-67:13, NN, Matofa Pese Apr. 29, 2009 Depo. at 17:20-18:10.  Further, a

Quarantine Public Health Officer, Commander Kimberly Walker ("CDR Walker"),

who later assisted in providing CPR assistance to Michael, stated in her affidavit

that she saw only a "clear plastic shunt tubing secured to [Michael's] left foot."

JSE 54 at 3.

34.     Given the specificity of the Incident Detail Report compared to

the testimony of individuals who were either not looking for an IV and/or were

responding to the emergency situation created when Michael stopped breathing,

the court finds that Plaintiffs have proven by a preponderance of the evidence that

an IV line and bag were connected to Michael throughout the customs process.

35.     Upon deplaning, the Futi Party walked to the CBP Federal

Inspection Service ("FIS") area.  JSF ¶ 40.  Because it takes approximately four

minutes to walk from the gate to customs, *see* Pls.' Ex. I, Otani Depo. at 18:1-9;

Pls.' Ex. J at 606, the Futi Party arrived at customs around 5:36 a.m.

36.     At the CBP FIS area, the Futi Party went to Booth 35 for

primary inspection.  JSF ¶ 42.

37.     CBP Officer Cindy Gillis ("Officer Gillis") was working at

Booth 35.  While Officer Gillis does not receive notices about travelers with health

issues and had no prior knowledge of Michael, Pls.' Ex. B, Officer Gillis Depo. at

48:4-49:21, she immediately recognized Nurse Veavea as a nurse both by the hospital "scrubs," as well as the LBJ Hospital ID badge that Nurse Veavea wore. JSF ¶ 43.

38.     Officer Gillis testified that she did not see the IV line and bag connected to Michael, but did observe that Nurse Veavea was carrying a bag with an oxygen Ambu mask.  Pls.' Ex. B, Officer Gillis Depo. at 56:2-57:12.

39.     The court finds Officer Gillis' testimony that she did not see the IV bag credible.  The court viewed the videotape of Officer Gillis' testimony -- Officer Gillis was able to fairly recollect the events that occurred with some detail and her testimony on this point appears credible.  Further, while Officer Gillis originally testified that the bag Nurse Veavea was carrying was clear plastic "around eight inches square," *id.* at 56:24-57:8 -- and later changed her testimony to state that the bag she saw was a "woven handbag" *id.* at Corrections to Transcript of March 31, 2009 of Cindy Gillis -- it is reasonable that even if Officer Gillis saw a clear plastic bag, she did not know that it was an IV bag.  Michael was fully covered in a blanket, *id.* at 67:1-68:23, and the booth walls are high enough such that the IV line was not in plain sight.  *See* JSEs 38-40.

40.     While at primary inspection, Michael was held by Mrs. Futi and did not display any signs of distress.  JSF ¶ 47.

41.     Nurse Veavea was the only person in the Futi Party that communicated orally with CBPO Gillis.  *Id.* ¶ 44.  Mrs. Futi does not speak English.  Pls.' Ex. G, Veavea Depo. at 121:13-17.

42.     During processing, Nurse Veavea told Officer Gillis that she had an "emergency appointment" at Kapiolani.  JSF ¶ 46.  Specifically, while Officer Gillis testified that Nurse Veavea "stated that [she] had an emergency appointment at Kapiolani," Pls.' Ex. B, Officer Gillis Depo. at 59:25-60:3, Nurse Veavea testified that she told Officer Gillis that she "had a patient with me and that we need to go [to the hospital]."  Pls.' Ex. G, Veavea Depo. at 98:22-99:3.

43.     Officer Gillis further testified that in response to Nurse Veavea's statement that she had an emergency appointment at Kapiolani, she asked Nurse Veavea how they were getting to the hospital and whether an ambulance was waiting for them.  Pls.' Ex. B, Officer Gillis Depo. at 60:4-13.  According to Officer Gillis, Nurse Veavea provided no response.  *Id.*  There was no further discussion regarding the need to get to Kapiolani or Michael's medical condition -- Officer Gillis asserts that beyond the questions she asked, she did not ask Nurse Veavea why they needed to go to the hospital because she was busy completing her inspection.  *Id.* at 113:5-22.

44.     In comparison, Nurse Veavea could not recall whether Officer Gillis asked her these questions, but testified that Officer Gillis asked questions regarding "forms and papers, not the patient."  Pls.' Ex. G, Veavea Depo. at 98:9-21.  Nurse Veavea further asserts that she did not provide any other information about Michael because Officer Gillis "brushed me off" by turning away and the Futi Party was then taken to secondary screening by Supervisory Customs and Border Protection Officer ("SCBPO") Stan Gillis (Officer Gillis' husband).  *Id.* at 98:22-100:1.

45.     Nurse Veavea did testify, however, that she felt that she had "made it clear" to Officer Gillis that they needed to leave "without delay."  *Id*. at 100:2-3.  In comparison, Officer Gillis testified that it was not made clear to her that the Futi Party needed to go to Kapiolani "right then and there," and that "it was not made clear to [her] that it was urgent, urgent situation."  Pls.' Ex. B, Officer Gillis Depo. at 70:15-24; *see also id.* at 113:2-4.

46.     To assist in determining whether Nurse Veavea or Officer Gillis has provided a more accurate recitation of the initial screening of the Futi Party -- and in particular whether Officer Gillis asked the two follow-up questions, and whether Nurse Veavea expressed a sense of urgency in the need to get to Kapiolani -- the court reviewed the full video depositions of both Officer Gillis and Nurse

17

Veavea.[4]  Based upon consideration of all the evidence presented and after having the opportunity to carefully view both Nurse Veavea's and Officer Gillis' demeanor and answers under deposition questioning, the court credits Officer Gillis' testimony that after she was told of the emergency appointment at Kapiolani, she asked the two follow-up questions -- *i.e.*, how they were getting to the hospital and whether an ambulance was waiting for them -- and Nurse Veavea did not respond to these questions.

47.    Specifically, while the court does not fully credit either Officer Gillis' or Nurse Veavea's testimony, the court makes the finding in paragraph 46 based on the following: (1) a determination, made after a careful viewing of the video depositions, that Officer Gillis' testimony on this subject was credible based on her demeanor and overall manner of testifying; (2) a determination that Officer Gillis displayed a better recollection of events than Nurse Veavea; (3) the fact that Nurse Veavea did not deny that Officer Gillis asked the two follow-up questions, but instead testified that she could not recall if these questions were asked; and (4) the fact that Nurse Veavea, as set forth below in paragraph 49, provided inconsistent statements regarding material events.

---

[4]  Pursuant to the Stipulation and Order Regarding Alternative Trial Procedures, the court reserved the right to examine the videos of deposition testimony where available.

18

48.    The court further finds that during her interaction with Officer Gillis, Nurse Veavea did not express a sense of urgency for Michael to depart for Kapiolani, beyond stating that he had an emergency appointment at Kapiolani (or words to that effect).  This finding is based on the following: (1) a determination, made after a careful viewing of the video depositions, that Officer Gillis' testimony setting forth the sequence of events appeared credible based on her demeanor and overall manner of testifying; (2) the fact that Nurse Veavea in fact appeared unconcerned for Michael's condition while at CBP as evidenced by her failure to check Michael's pulse rate and/or oxygen saturation level until 6:06 am when Michael first went into distress, despite the fact that she had a clear opportunity to do so while seated in secondary; and (3) the fact that Nurse Veavea, as set forth below in paragraph 49, provided inconsistent statements regarding material events.

49.    Regarding Nurse Veavea's inconsistent testimony, Nurse Veavea provided contradictory statements regarding this precise issue -- *i.e.*, what she told Officer Gillis and/or SCBPO Gillis.  Specifically, shortly after the incident, Nurse Veavea is reported to have made statements that: (1) when she learned that secondary screening was necessary, she "relayed baby's special needs, told to be quiet," JSE 19 at 15 (statement to Kaiser Permanente Emergency Department on February 8, 2008); (2) when she learned that secondary screening

19

was necessary, she "reported to customs agent the baby is sick and needs to get to the hospital," JSE 51 at 4 (statement to City and County of Honolulu Department of Medical Examiner); and (3) she told SCBPO Gillis that "the child was under duress before being placed in secondary."[5]  JSE 52 at 470 (Assistant Port Director Jeffrey Sawyer affidavit, referring to statement relayed by the Honolulu Police Department).  While it is unclear whether these first two statements were allegedly made to Officer Gillis, SCBPO Gillis, or both of them, Nurse Veavea provided no such testimony during her deposition, *see* Pls.' Ex. G, Veavea Depo. at 98:22-99:8, and testified that she made the statement about needing to get to the hospital only once, in front of Officer Gillis and not SCBPO Gillis, *see id*. at 173:1-18, and her only statement to SCBPO Gillis concerned how long she would be kept in secondary.  *Id.* at 102:23-104:20.  SCBPO Gillis' testimony corroborates this latter version, because he testified that Nurse Veavea did not relay to him that they needed to leave.  Pls.' Ex. K, SCBPO Gillis Depo. at 48:1-13.

---

[5]  Plaintiffs cite to this evidence as showing third-party corroboration of Nurse Veavea's claims that she told CBP officials that Michael needed to get to Kapiolani, and the United States objects on the basis that the evidence is cumulative and does not provide independent verification of Nurse Veavea's statements to Officer Gillis and/or SCBPO Gillis.  Doc. No. 100, Obj. No. 4.  The court overrules the United States' first objection, but sustains the second objection to the extent Plaintiffs suggest the evidence provides *third-party corroboration* of what Nurse Veavea told Officer Gillis and/or SCBPO Gillis, as opposed to prior statements made by Nurse Veavea herself.

50.     Officer Gillis completed her inspection of Nurse Veavea and Michael at 5:44 a.m and 5:47 a.m., respectively.   JSF ¶ 48.

51.     Upon reviewing Mrs. Futi's passport, Officer Gillis saw that Mrs. Futi did not have the visa required for individuals from Western Samoa and had not filled out any of the required forms for entry.   Pls.' Ex. B, Officer Gillis Depo. at 70:21-72:9.

52.     When Officer Gillis raised the fact that Mrs. Futi did not have a visa, Mrs. Futi produced a facsimile stating that the visa requirement was waived and mentioning medical treatment.   *Id.* at 85:2-18, 90:2-11, 118:20-119:9.

53.     Even with the facsimile, Mrs. Futi was still required to fill out additional administrative forms and go through secondary screening.   *Id.* at 90:7-20; *see also* JSE 52, Sawyer Aff. at 449 ("Those without proper documents or who require additional administrative processing, including those to whom special consideration for a visa waiver or parole was afforded through permission to board, . . . are referred to a document secondary processing area.").

54.     To assist with the additional processing needed, Officer Gillis referred Mrs. Futi, accompanied by Nurse Veavea and Michael, to secondary inspection by signaling for assistance from SCBPO Gillis.   *See* JSF ¶ 49.

55.     When SCBPO Gillis arrived at Booth 35, Officer Gillis told him that the Futi Party needed to go to secondary inspection for a visa and that Nurse Veavea and Michael were U.S. nationals.  Pls.' Ex. B, Officer Gillis Depo. at 120:22-24.

56.     Officer Gillis did not mention to SCBPO Gillis that Nurse Veavea had an emergency appointment at Kapioloani.  *Id.* at 121:17-19.

57.     Nurse Veavea did not ask Officer Gillis if she was allowed to leave the airport with Michael while Mrs. Futi stayed behind to complete the inspection.  Pls.' Ex. G, Veavea Depo. at 173:23-174:3.

58.     Nor did Officer Gillis suggest that Nurse Veavea and Michael could proceed to Kapiolani without Mrs. Futi -- she believed that the Futi Party would first need an official document giving consent for Michael to leave without Mrs. Futi.  Pls.' Ex. B, Officer Gillis Depo. at 135:21-137:4.

## E.     CBP Secondary Processing

59.     At approximately 5:55 a.m., SCBPO Gillis escorted the Futi Party from primary inspection Booth 35 to the CBP secondary inspection area. JSF ¶ 51.  The secondary inspection area was a locked room, and no officer was present in the room.  *Id.* ¶ 53.

60.     Secondary inspection was to include an interview, completion of CBP Forms I-94 and I-193, processing through the ENFORCE electronic data base system, taking of photographs, and fingerprinting.  This type of secondary inspection takes approximately 30 minutes.  *Id.* ¶ 50.

61.     CBP Directive 3340-030A, titled "Secure Detention Procedures at Ports of Entry," "establishes a national policy for the temporary detention of persons by [CBP] in secure areas at Ports of Entry (POEs)."  JSE 1, § 1.  Directive 3340-030A explains that CBP officers have "authority to detain applicants for admission to determine their admissibility into the United States," and that "[d]uring an inspection at a port of entry, detention begins when the traveler is referred into secondary and when processing is underway or subject is waiting processing."  *Id.* § 3.1; *see also* Pls.' Ex. K, SCBPO Gillis Depo. at 93:18-21.

62.     Directive 3340-030A further provides that "[a]ll persons placed in an unattended secure area at a CBP facility will be asked whether they have a medical problem or condition that may require some attention."  JSE 1, § 9.4.1.  A "secure area" "refers to areas such as a detention cell, search room, interview room, or security office where an individual is detained for a temporary period of time out of public view and cannot flee."  *Id.* § 4.2.  An "unattended

area" "refers to a detention cell, confinement area, or secure area where a detainee may be out of view of an officer."  *Id.* § 4.4.

63.     The court finds that the Futi Party was placed in an unattended secure area.  Specifically, SCPBO Gillis testified that he placed the Futi Party in a "secondary inspection area" "for further inspection."  Pls.' Ex. K, SCBPO Gillis Depo. at 94:93:23-94:11.  The secondary inspection area was a locked room with no officer was present, *see* JSF ¶ 53, such that the Futi Party could not flee and was out of both public view and the view of CBP officers.

64.     The United States nonetheless argues that Directive 3340-030A does not apply to Michael because detention involves securing a passenger in preparation for an adverse action such that Michael was never "detained."  *See* United States Br. at 32.  The court rejects this argument for several reasons.  First, Directive 3340-030A does not apply exclusively to "detainees," but also provides guidance regarding "[a]ll persons placed in an unattended secure area at a CBP facility."  *See* JSE 1, § 9.4.1.  Second, the United States has no competent evidence to support its definition of "detention."  Instead, the United States relies on the deposition testimony of Officer Gillis, *see* Pls.' Ex. B, Officer Gillis Depo. at 149:9-24, but Officer Gillis was not designated as the United States' witness on this topic, was not working secondary, and her expertise on this topic has not

24

otherwise been established.  Finally, even if Michael needed to be "detained" for Directive 3340-030A to apply, the United States' suggestion that Michael was not detained is a red herring.  It should go without saying that Michael -- a fifteen-day old baby -- could not leave on his own.  Further, the entire Futi Party was locked in the room and neither Nurse Veavea nor Michael were given the option of leaving.

65.     SCBPO Gillis observed that Nurse Veavea was wearing scrubs, and thought it unusual because when a patient is traveling with a nurse, that patient is likely a critical care case and is transported via ambulance from the airport.  Pls.' Ex. K, SCBPO Gillis Depo. at 44:19-45:5.

66.     SCBPO Gillis did not ask Nurse Veavea any questions regarding Michael's medical condition.  *Id.* at 92:6-11.

67.     At secondary processing, Nurse Veavea asked SCBPO Gillis how long the secondary inspection would take.  Rather than provide an approximate time -- which he believed would be twenty minutes -- SCBPO Gillis advised Nurse Veavea that the secondary processing supervisor, Steven Wong, would be able to better answer her questions.  *Id*. at 20:19-25, 43:9-44:7, 91:24-92:5.

68.     There was no CBP personnel present in the secondary inspection area when SCBPO Gillis escorted the Futi Party into the room, or a few

25

minutes later when he escorted another passenger, Matofa Pese, into the room.  JSF ¶ 53; Pls.' Ex. K, SCBPO Gillis Depo. at 14:6-20.

69.     Michael was not displaying any signs of medical distress in secondary processing between the time the Futi Party entered the room and the time Mr. Pese entered the room.  JSF ¶¶ 51, 52.

## F.     Medical Crisis and Michael's Death

70.     Although Nurse Veavea had been instructed to continuously monitor Michael's oxygen saturation rate, she had not checked his pulse and oxygen level since leaving the plane.  *See* Pls.' Ex. P, Saldarriaga Depo. at 56:10-15 (testifying that it was important for Michael's oxygen saturation level to be continuously monitored); Pls.' Ex. G, Veavea Depo. at 148:3-22, 150:7-12.

71.     At approximately 6:06 a.m., Nurse Veavea noticed that Michael had turned unusually blue and his "respirations were becoming gasping."  Pls.' Ex. G, Veavea Depo. at 106:19-107:6; *see also* JSF ¶ 54.

72.     There is no evidence on the record that Nurse Veavea could not have monitored Michael's pulse and oxygen level before 6:06 a.m.  While Plaintiffs argue that the expert testimony of Dr. John J. Lamberti supports that it was not feasible for Nurse Veavea to check Michael's vital signs before his medical emergency, Dr. Lamberti's testimony addresses deplaning only, and

provides no reason why Nurse Veavea could not have checked Michael's vital

during the approximate eleven minute wait in the secondary processing area.  *See*

JSE 67, John Lamberti Sept. 2, 2009 Depo. at 78:10-15 ("When you get off the

plane after a long flight, unless the people coming from Samoa to Hawaii are much

more well behaved than anybody I've ever seen in America, then it's just a free for

all getting off the plane, and I think it would be very hard to take the baby's pulse,

much less do anything else.").

73.     Once Nurse Veavea noticed that Michael had turned blue and

was gasping, she took out her blood pressure monitor and oxygen saturation

monitor to check Michael's vital signs.  Pls.' Ex. G, Veavea Depo. at 107:22-108-

2.  Michael's oxygen saturation rate was in the sixties and seventies, which is "very

low" and was "very significant and problematic."  *Id.* at 108:3-18.  Indeed,

Michael's oxygen saturation rate during the flight was ninety seven.  *Id.* at 149:5-

14.  Michael's pulse rate was also "significantly low" -- in the seventies and

eighties, and should have been around 120.  *Id.*

74.     Nurse Veavea therefore began using her Ambu bag to deliver

artificial breaths to Michael.  *Id.* at 108:19-109:3.  After a one-minute cycle, *i.e.*,

6:07 a.m., Nurse Veavea checked for Michael's pulse, but could not detect it.  *Id.* at

109:11-15.  Michael was no longer gasping at this point, and Nurse Veavea

believed that he had already stopped breathing at this time.  *See id.* at 110:3-8.

75.    Next, Nurse Veavea pounded on the locked door and called out

for assistance, and then returned to Michael to continue with the Ambu bag and

perform chest compressions.  *Id.* at 109:11-110:22, 111:25-112:4.  CBP officers

near the secondary inspection area heard the calls for help and to call 9ll, and

responded to the situation.  JSF ¶ 55; JSEs 21, 26, 27, 29.

76.    At 6:07 a.m., CBP Officer Malcom Segawa enlisted the

assistance of CDR Walker, and at 6:08 a.m., CDR Walker arrived at the secondary

inspection area to help Nurse Veavea administer CPR to Michael.  JSF ¶ 58.

77.    An EMS Report shows an emergency call coming to the AMR

Airport office from the CBP inspection area at 6:08 a.m., *id.* ¶ 56, and a Hawaii

EMS Incident Detail Report shows the intake of an emergency 911 call from the

CBP inspection area at 6:10 a.m.  *Id.* ¶ 57.

78.    At 6:12 a.m., CDR Walker attempted to find Michael's pulse

after Michael's hand released holding onto CDR Walker's hand, but CDR Walker

could not find a pulse.  Defs.' Ex. JJ at 10-12.  The parties agree that Michael's

pulse stopped at approximately 6:12 a.m.  JSF ¶ 59.

79.     Nurse Veavea and CDR Walker continued CPR until paramedics arrived and took over.  *See* Pls.' Ex. G, Veavea Depo. at 115:4-11.  An airport EMT and an airport crash and rescue crew member arrived at the secondary processing area at 6:17 a.m. and 6:18 a.m., respectively.  JSF ¶ 58.

80.     At 6:34 a.m., Michael was transported from the secondary inspection area; at 6:40 a.m., Michael departed Honolulu Airport in a City and County of Honolulu ambulance to Kaiser Hospital in Moanalua.  *Id.* ¶ 60.

81.     Michael was pronounced dead by Kaiser physicians at 7:21 a.m. *Id*.

82.     The parties' experts have differing opinions regarding what caused Michael's death.  The United States' expert, Dr. Ashraf Mozayani, opines that morphine toxicity was the main contributing factor to Michael's death.  JSE 64 at 88.  In comparison, the death certificate prepared by Dr. William Goodhue states the cause of death as failure to receive required oxygen.  JSE 57 at 27.  Plaintiffs' expert, Dr. John Lamberti, concurs with Dr. Goodhue's conclusion.  JSE 58.

83.     Regardless of whether morphine toxicity or oxygen depletion caused Michael's death, both conditions were treatable.  *See* JSE 64 at 7 (stating that morphine toxicity can be treated with Naloxone); JSE 67, Lamberti Depo. at 99:4-100:1 (stating that Michael would have survived if given oxygen before he

coded).  No evidence was presented, however, specifying a particular time by which Michael could have been treated and survived.  In other words, there is no evidence explaining how long into Michael's medical emergency that treatment could have saved his life.

### G.      Transportation to Kapiolani

84.      While LBJ did not arrange for transportation for the Futi Party from the airport to Kapiolani, Simamao Nofoa, Mrs. Futi's cousin by marriage, arrived at Honolulu Airport at about 5:35 a.m. "just in case" she could be of assistance in transporting the Futi Party to Kapiolani and/or to pick up Mrs. Futi's luggage from her.  Pls.' Ex. Q, Simamao Nofoa Aug. 20, 2009 Depo. at 22:3-23:9, 31:3-10, at Correction Sheet.  Nofoa had not been in contact with either Nurse Veavea or Mrs. Futi, but went to the airport at the request of her brother.  *Id.* at 26:24-27:17.

85.      Nofoa parked her car at the outdoor parking structure at the airport and waited at the baggage claim area.  *Id.* at 16:5-17:1.  Nofoa testified that her car was less than a three minute walk from the baggage claim area.  *Id.* at 17:2-

16.[6]  She eventually left and headed to Kapiolani, however, after she did not see

the Futi Party.  *Id.* at 19:13-19:20.[7]

        86.      Another source for a ride to Kapioloani was Solipo Matai.

Nurse Veavea had contacted Matai to pick her up at the airport as a "Plan B" for

transportation.  Defs.' Ex. OO, Solipo Matai May 8, 2009 Depo. at 11:19-15:7.

Matai testified that she arrived at the airport around 5:45 a.m., *id.* at 16:14-17:5,

19:1-6; looped around the airport twice, *id.* at 20:6-11, spoke briefly with her

friend Mafa Ierome who had been on the flight, *id.* at 20:12-21-5; Doc. No. 121,

Mata Decl. ¶¶ 2-3,[8] and then looped around the airport a final time.  Defs.' Ex. OO,

---

[6]  Regarding how far away her car was from baggage claim, Nofoa specificaly testified as follows:

| | |
|---|---|
| Q. | How far did you have to walk to get to where - to get from your parking spot to where everyone was waiting? |
| A. | Not that far.  I would say less than two minutes.  Less than three minutes. |
| Q. | How far in terms of distance? |
| A. | It was right across the street from the baggage area. |
| Q. | Any it took you about three minutes to walk over there? (Plaintiffs' Counsel: "Less than.") |
| A. | It was less than that. |
| Q. | More than -- how much less than three? |
| A. | I don't know. |

Pls.' Ex. Q, Simamao Nofoa Aug. 20, 2009 Depo. at 17:1-16.

[7]  The United States objects to Nofoa's testimony as irrelevant and/or having little probative value.  Doc. No. 100, Obj. No. 8.  The court overrules this objection -- given that Nofoa was waiting at the baggage claim area for the Futi Party, it is more probable than not that she would have met up with the Futi Party if they had passed through customs.

[8]  The United States originally objected to Plaintiffs' argument identifying Mafa Ierome as the person Matai spoke with at the airport as unsupported by any evidence.  Doc. No. 100,

(continued...)

Matai Depo. at 21:6-10.  Believing that she had missed Nurse Veavea, Matai proceeded to drive to Kapiolani.  *Id.* at 24:6-12.

87.    Matai testified that during her drive to Kapiolani, she sat in traffic for "more than half an hour" and that the trip took thirty five or forty minutes.  *Id.* at 24:6-21.  While Matai testified that she believed she left the airport around 6:00 a.m., the court finds that Matai left several minutes after 6:02 a.m. -- Mafa Ierome did not clear customs until 6:02 a.m., *see* JSE 13, and Matai circled the airport one more time after speaking with Ierome.

88.    The distance from customs to Kapiolani is approximately seven miles, with almost all of it on the H-1 freeway eastbound.  *See* Pls.' Ex. R (letters from private investigator).

89.    While it was raining in Honolulu, *see* JSE Ex. 32, archived traffic video footage shows little traffic on H-1 at the Middle Street and Punahou Street exits from between 5:30 and 6:00 a.m., both of which are between the Honolulu Airport and Kapiolani.[9]  *See* JSEs 30-32.

---

[8](...continued)
Obj. No. 7.  The court deems moot this objection in light of the submission of the June 18, 2010 Declaration of Solipo Matai.  *See* Doc. No. 120.

[9]  The United States objects to Plaintiffs' inclusion in their Opening Trial Brief of still images of the traffic reports on the basis that the court should view the traffic reports in their entirety.  Doc. No. 100, Obj. No. 5.  Because the traffic reports were submitted in their entirety and viewed by the court, the court deems this objection moot.

## IV.  <u>CONCLUSIONS OF LAW</u>

90.    The court has jurisdiction over this case under the FTCA, which grants federal courts jurisdiction over damages claims against the United States "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment."  8 U.S.C. § 1346(b); *see also Adams v. United States*, 420 F.3d 1049, 1051 (9th Cir. 2005); *Valdez v. United States*, 56 F.3d 1177, 1179 (9th Cir. 1995).

91.    This waiver of sovereign immunity allows the government to be held liable for negligence "in the same manner and to the same extent as a private individual under like circumstances."  28 U.S.C. § 2674.

### A.     Subject Matter Jurisdiction

92.    The FTCA's waiver of sovereign immunity does not apply to all tort claims.  Relevant to this action, the government has not waived its immunity for claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."  28 U.S.C. § 2680(a).

33

93.    Plaintiffs assert that CBP was negligent from the time its officers first acted upon Mrs. Futi's visa waiver request through the time the SCBPO Gillis placed the Futi Party in the locked secondary screening room.  In response, the United States argues that several of CBP's allegedly negligent acts are protected by the discretionary function.  The court first outlines the framework for the discretionary function exception, and then applies the framework to the United States' arguments.

### 1.    *Framework*

94.    The purpose of the discretionary function exception is to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic and political policy through the medium of an action in tort."  *United States v. Gaubert*, 499 U.S. 315, 323 (1991).  "Whether a challenged action falls within the discretionary function exception requires a particularized analysis of the specific agency action challenged."  *GATX/Airlog Co. v. United States*, 286 F.3d 1168, 1174 (9th Cir. 2002).

95.    The court must apply a two-part test to determine if the discretionary function exception applies.

96.    "First, for the exception to apply, the challenged conduct must be discretionary -- that is, it must involve an element of judgment or choice."

*GATX/Airlog Co.*, 286 F.3d at 1173.  "[W]here the alleged conduct violates a mandatory directive, whether by statute, regulation or policy, the conduct is not discretionary because there is no choice or judgment involved." *Kelly v. United States*, 241 F.3d 755, 760 (9th Cir. 2001).  Under such circumstances, this first requirement is not met because "'the employee has no rightful option but to adhere to the directive.'" *GATX/Airlog Co.*, 286 F.3d at 1173-74 (quoting *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)).

97.     If the first requirement is met, however, the court must then "determine whether that judgment is of the kind that the discretionary function exception was designed to shield." *Id.* at 1174 (quoting *Berkovitz*, 486 U.S. at 536).  "Only those exercises of judgment which involve considerations of social, economic, and political policy are excepted from the FTCA by the discretionary function doctrine." *Alfrey v. United States*, 276 F.3d 557, 561 (9th Cir. 2002) (quoting *Sigman v. United States*, 217 F.3d 785, 793 (9th Cir. 2000)).  "The court must focus on "the nature of the actions taken and on whether they are susceptible to policy analysis.'" *GATX/Airlog Co.*, 286 F.3d at 1174 (quoting *Gaubert*, 499 U.S. at 325); *see also Nurse v. United States*, 226 F.3d 996, 1001 (9th Cir. 2000) (stating that the decision at issue "'need not *actually* be grounded in policy considerations' so long as it is, 'by its nature, susceptible to a policy analysis'"

35

(quoting *Miller v. United States*, 163 F.3d 591, 593 (9th Cir. 1998))).  "When a statute, regulation or agency guideline allows a government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion."  *Weissich v. United States*, 4 F.3d 810, 814 (9th Cir. 1993) (citing *Gaubert*, 499 U.S. at 324).

98.     The focus of this second requirement, however, remains on the specific action challenged.  Relevant to this action, certain law enforcement decisions -- including the decisions of border agents such as CBP officers in determining whether to detain an individual -- may involve discretion, but "do not involve the sort of generalized social, economic and political policy choices that Congress intended to exempt from tort liability."  *Garcia v. United States*, 826 F.2d 806, 809 (9th Cir. 1987) (citing *Caban v. United States*, 671 F.2d 1230 (2d Cir. 1982)); *see also Munyua v. United States*, 2005 WL 43960, at *6-7 (N.D. Cal. Jan. 10, 2005).  But not all decisions of law enforcement officials fall outside the protection of the discretionary function exception -- the focus is on the action at issue as opposed to the status of the individual, and decisions made outside individualized detention determinations may still invoke policy considerations implicating the discretionary function exception.  *See, e.g.*, *Vickers v. United States*, 228 F.3d 944, 950 (9th Cir. 2000) (finding that a claim against the INS for

negligent training and supervision fell within the discretionary function exception); *Weissich v. United States*, 4 F.3d 810, 813-14 (9th Cir. 1993) (finding that claims against the U.S. Probation Service for negligent supervision and negligent failure to warn were protected by the discretionary function exception).

99.   The government has the burden of proving the discretionary function exception, and if it applies, the court lacks subject matter jurisdiction. *GATX/Airlog Co.*, 286 F.3d at 1173.

### 2.   *Application*

100.   The court finds that the United States has carried its burden of establishing that the following actions fall within the discretionary function exception: (1) CBP's failure to disseminate Michael's medical information, (2) CBP's failure to adopt a policy regarding when a minor may be released without its parent, and (3) CBP's training of Officer Gillis.

101.   As to CBP's failure to disseminate Michael's medical information, the court finds that the first requirement of the discretionary function exception is met because such conduct involves an element of judgment.  The CBP's Area Port of Honolulu Standard Operating Procedures ("SOP") outlines the "procedures for receipt and processing of pre-arrival requests for [visa] waivers or Port-of-Entry paroles," JSE 68; nowhere does this SOP require CBP to disseminate

the medical information of individuals passing through customs.  The second requirement is also met because CBP's decision not to disseminate Michael's medical information is susceptible to policy considerations of medical privacy of the travelers, feasibility of disseminating this information, and training personnel regarding what they should do once they receive such information.

102.   Regarding CBP's alleged failure to adopt a policy regarding who a minor may be released to after passing customs, the first requirement of the discretionary function is met because there were no statutes, regulations, or policies in place requiring CBP to adopt policies on this topic.  Further, the fact that the Secretary of Homeland Security did not promulgate any policies addressing this issue is well within the Secretary's discretion.  *See* 8 U.S.C. § 1103(a) (providing that the Secretary of Homeland Security has authority to issue regulations "as he deems necessary for carrying out his authority under the provisions of the [Immigration and Naturalization Act]").  The second prong of the discretionary function exception is also met because CBP's failure to adopt rules when a minor may be released without his parent is "susceptible to policy analysis."  *See Gaubert*, 499 U.S. at 323.  Specifically, whether to promulgate a rule requiring CBP officers to notify families when a minor may proceed through customs raises questions of feasibility, practicality, and priorities of CBP.  *See*

Def.'s Ex. DD (describing the exercise of discretion in CBP procedures); *Nurse*, 226 F.3d at 1002 ("Typically, the promulgation of policies and rules is protected by the FTCA's discretionary function exception."); *see also United States v. Empresa de Viaco Aerea Rio Grandense*, 467 U.S. 797, 819-20 (1984).

103.   Finally, the court finds that CBP's alleged failure to properly train Officer Gillis falls within the discretionary function exception.  The Ninth Circuit has "held the hiring, supervision, and training of employees to be discretionary acts."  *Doe v. Holy See*, 557 F.3d 1066, 1084 (9th Cir. 2009).  Such "acts fall squarely within the discretionary function exception."  *Nurse*, 226 F.3d at 1001.  Training decisions fall within the exception because decisions on the extent of training involve the exercise of political, social, or economic judgment, involving "consideration of fiscal constraints, public safety, the complexity of the task involved, the degree of harm a wayward employee might cause, and the extent to which employees have deviated from accepted norms in the past."  *Burkhart v. Wash. Metro. Area Transit Auth*., 112 F.3d 1207, 1217 (D.C. Cir. 1997) (holding that "decisions concerning the hiring, training, and super[vision]" of employees are discretionary); *see also Gager v. United States*, 149 F.3d 918, 921 (9th Cir. 1998) (finding claims for negligent training and supervision barred by the discretionary function exception).

104.   In opposition, Plaintiffs argue that CBP's failure to disseminate Michael's medical information is not discretionary -- and therefore does not meet the first prong of the discretionary function test -- because the United States has admitted that "CBP does not question a medical assessment provided by a medical professional and will afford whatever inspectional accommodations are specifically requested."  *See* Pls.' Final Trial Br. at 8 (citing JSE 52 at 0447-48).  This statement addresses only what CBP must do when it receives a request for accommodation from a medical professional; it does not address what additional steps, if any, CBP should take beyond complying with such requests.  There is no evidence that anyone from LBJ requested that CBP disseminate Michael's medical information or that CBP had a policy to provide medical information regarding passengers to all CBP officers.  Further, CBP did not fail to make any accommodation requested by a medical professional.  Accordingly, whether CBP should have taken any additional steps with Michael's medical information was well within its discretion.

105.   Plaintiffs also argue that pursuant to *Garcia v. United States*, 826 F.2d 806 (9th Cir. 1987), the discretionary function exception does not apply to any of these acts because they involve the actions of law enforcement agents. While the court recognizes that individual law enforcement decisions regarding

40

detainment do not involve the type of policy considerations that invoke the

discretionary function exception, the actions discussed above do not fit within the

type of decisions contemplated in *Garcia*.  Rather, as discussed above, these

actions are susceptible to policy considerations and therefore fall within the

exception.

106.   Turning to the United States' other assertions on the

discretionary function exception, the court finds that the United States has not

carried its burden.

107.   As to Officer Gillis' failure to notify SCBPO Gillis that Nurse

Veavea had an emergency appointment, this omission does not appear to violate

any particular policy.  This omission, however, fails the second inquiry because it

is not susceptible to the type of policy analysis the discretionary function exception

protects.  *See Alfrey*, 276 F.3d at 561.  Specifically, at the time Officer Gillis

allegedly should have told SCBPO Gillis about Nurse Veavea's emergency

appointment, Officer Gillis was forwarding the Futi Party to additional screening

and had been told of the emergency appointment at Kapiolani.  This decision falls

within *Garcia's* proscription that individual law enforcement decisions -- including

those of border agents such as CBP regarding detainment -- "do not involve the

sort of generalized social, economic and political policy choices that Congress

41

intended to exempt from tort liability." *Garcia*, 826 F.2d at 809 (finding that the discretionary function exception did not shield a border patrol agent from negligence claims arising after he shot the plaintiff during a border incident); *see also Caban*, 671 F.2d at 1233 ("[W]e find that the activities of the INS agents who detained appellant do not fall within the purview of § 2680(a) because the activities are not the kind that involve weighing important policy choices."). This omission is therefore not shielded by the discretionary function exception.

108.   Nor has the government carried its burden of establishing that SCBPO Gillis' failure to ask the Futi Party whether Michael needed medical assistance is subject to the discretionary function. This omission fails the first inquiry -- CBP Directive 3340-030A § 9.4.1 provides that "[a]ll persons placed in an unattended secured area at a CBP facility will be asked whether they have a medical problem or condition which may require some attention." *See* JSE 1 § 9.4.1; *see also id.* § 4.4 (defining "unattended area"). This policy is clear and mandatory, and applies to these circumstances because SCBPO Gillis placed the Futi Party in a locked room with no attending CBP officer. Accordingly, SCBPO Gillis did not have discretion to not ask the Futi Party whether any of them had a medical problem requiring attention.

42

109.    Further, even if CBP Directive 3340-030A § 9.4.1 did not apply, the court finds that SCBPO Gillis' failure to ask the Futi Party whether Michael needed medical assistance fails the second inquiry.  It was apparent that Nurse Veavea was traveling with a patient, the Ambu mask was readily visible, and SCBPO Gillis knew that he was locking the Futi Party in a room with no CBP Officer present.  Under these circumstances, the court finds that SCBPO Gillis' failure to ask Nurse Veavea about the Futi Party's medical needs is not susceptible to the type of policy analysis the discretionary function exception protects.  This omission is therefore not shielded by the discretionary function exception.

**B.    Merits of Plaintiffs' Claim**

110.    Turning to the merits of Plaintiffs' claims, the court determines FTCA liability "in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b); *see also* 28 U.S.C. § 2674; *Bartleson v. United Sates*, 96 F.3d 1270, 1274 (9th Cir. 1996) (stating that "state law determines the federal government's tort liability").

111.    Because CBP's alleged acts all occurred in Hawaii, the court applies Hawaii tort law.

112.    Under Hawaii law, a plaintiff establishes a negligence claim by proving:

43

1. A duty or obligation, recognized by the law, requiring the defendant to conform to a certain standard of conduct, for the protection of others against unreasonable risks;
2. A failure on the defendant's part to conform to the standard required: a breach of the duty;
3. A reasonably close causal connection between the conduct and the resulting injury[;] and
4. Actual loss or damage resulting to the interests of another.

*Dairy Road Partners v. Island Ins. Co.*, 92 Haw. 398, 419, 992 P.2d 93, 114 (2000); *see also Kaho'ohanohano v. Dep't of Human Servs.*, 117 Haw. 262, 287 n.31, 178 P.3d 538, 563 n.31 (2008); *Cho v. State*, 115 Haw. 373, 379 n.11, 168 P.3d 17, 23 n.11 (2007).

113.   "It is well-settled that, in any negligence action, the plaintiff -- not the defendant -- has the burden of proving the requisite elements, including legal causation." *Miyamoto v. Lum*, 104 Haw. 1, 15, 84 P.3d 509, 523 (2004).  "It is plaintiff's burden to prove defendant's negligence by a preponderance of the evidence." *Murakami v. County of Maui*, 6 Haw. App. 516, 522, 720 P.2d 342, 346 (1986), *aff'd by* 69 Haw. 43, 731 P.2d 787 (1987).

114.   As to the first element of a negligence claim, a defendant "owes a duty of care only to those who are foreseeably endangered by the conduct and only with respect to those risks or hazards whose likelihood made the conduct [or omission] unreasonably dangerous." *Pulawa v. GTE Haw. Tel*, 112 Haw. 3, 12

44

143 P.2d 1205, 1214 (Haw. 2006).  A defendant breaches a duty to protect a plaintiff if the defendant fails to do "what a reasonable and prudent person would have done under the circumstances."  *See Knodle v. Waikiki Gateway Hotel, Inc*., 69 Haw. 376, 384, 742 P.2d 377, 387 (1987).  "However, the conduct of the mythical reasonable and prudent person will vary with the situation with which he or she is confronted because what is reasonable and prudent in the particular circumstances is marked out by the foreseeable range of danger."  *Doe v. Hawaii*, 100 Haw. 34, 82, 58 P.3d 545, 593 (2002).  In determining the existence of a duty, the court must consider whether the relationship between the parties is such that "the community will impose a legal obligation upon one for the benefit of the other."  *Knodle*, 69 Haw. at 383, 742 P.2d at 385; *see also Schwenke v. Outrigger Hotels Haw., LLP*, 122 Haw. 389, 391, 227 P.3d 555, 557 (Haw. App. 2010).

115.   The court finds that a special relationship exists between CBP and the individuals it processes, which imposes on CBP certain duties relevant to this action.  In processing the Futi Party through customs, CBP owed a duty to protect the Futi Party from foreseeable dangers that this customs process presented.  This duty includes the duty to "not question a medical assessment provided by a medical professional and to afford whatever inspectional accommodations are specifically requested," *see* JSE 52 at 0448, as well as to render assistance to

travelers requiring immediate emergency assistance when such emergency

condition is brought to the attention of a CBP employee.  *See* JSE 52, Sawyer Aff.

at 0462.  Beyond these duties of responding to requests made, the court finds that

CBP officers have a further duty to investigate and/or inquire where they are

presented with a situation that suggests further inquiry is necessary in order to fully

understand the dangers that the situation presents.  *See* 57a Am. Jur. 2d § 123; *see*

*Doe*, 100 Haw. at 82, 58 P.3d at 593 ("[W]hat is reasonable and prudent in the

particular circumstances is marked out by the foreseeable range of danger.");

*Presswood v. Cook*, 658 So.2d 859, 862 (Miss. 1995) ("This Court recognizes that

where a situation suggests investigation and inspection in order that its dangers

may fully appear, the duty to make such investigation and inspection is imposed by

law." (quotations omitted)).

116.   Turning to the facts of this action, the court finds that even if

Officer Tornquist's actions are not protected by the discretionary function

exception, Officer Tornquist and CBP fulfilled their duty to Plaintiffs in reviewing

and granting Mrs. Futi's request for a visa waiver.  There is no evidence that CBP

questioned the medical assessment provided in the visa waiver request, and CBP

complied with everything asked of it in the form -- *i.e.*, it granted the visa waiver

request.

117.   To the extent that Plaintiffs argue that CBP should have disseminated the medical information about Michael or made additional accommodations, this argument is unpersuasive because no such requests were made.  The visa waiver request did not ask CBP to provide any additional accommodations to the Futi Party such as expedited screening or plane-side screening, and under these circumstances of a specific accommodation already being requested, CBP did not have an affirmative duty to independently review the request to determine what additional accommodations above and beyond what is requested should have been provided.  CBP officers are not medical professionals and to require them to make such judgment calls would extend their duties far beyond their training and expertise.

118.   Further, even if there are conceivably some circumstances under which CBP should take affirmative steps that are not explicitly asked of it, no such circumstances exist in this action.  The documents provided to CBP did not suggest that Michael presented an emergency requiring CBP to take any steps beyond what was asked of it.  At most, the waiver request instead indicated that Michael had a heart condition requiring him to travel to Honolulu for treatment.  Simply put, CBP fulfilled its duty by doing everything that was asked of it in the visa waiver request.

119.   In opposition, Plaintiffs argue that *Williams v. United States*, 450 F. Supp. 1040 (D. S.D. 1978), suggests that administrative personnel have a duty to ensure that medical information is dispensed.  Plaintiffs' reliance on *Williams* is misplaced.  *Williams* addressed a wrongful death claim based on a hospital's failure to notify county authorities of the discharge of an individual who ultimately killed someone.  Unlike this action, the hospital agreed to notify county authorities of the assailant's release and failed to take reasonable care to ensure that notification was provided.  *Williams*, 450 F. Supp. at 1044.  In comparison, CBP took all actions requested of it by approving the visa waiver request.

120.   As to Officer Gillis, the court finds that Plaintiffs have failed to show by a preponderance of the evidence that she breached her duties to the Futi Party in processing them through primary screening.

121.   As an initial matter, there is no evidence suggesting that Officer Gillis failed to follow any CBP protocols in processing the Futi Party.  Officer Gillis processed Nurse Veavea's and Michael's information, and then referred Mrs. Futi to secondary processing after seeing that additional forms needed to be filled out.  Even though Mrs. Futi's visa waiver request had been previously approved, secondary processing was still a necessary step to get Mrs. Futi through customs.

48

122.   The court further finds that the entirety of Officer Gillis' interactions with the Futi Party would not lead a reasonable CBP officer to believe that the Futi Party needed to proceed *immediately* to Kapiolani.  The circumstances presented to Officer Gillis triggered her duty to inquire to determine whether the time for customs processing posed any dangers to the Futi Party -- Nurse Veavea was dressed in hospital scrubs, was carrying an Ambu mask, and told Officer Gillis that she had an "emergency appointment" at Kapiolani.  Officer Gillis fulfilled her duty to the Futi Party, however, by asking Nurse Veavea how they were getting to the hospital and whether an ambulance was waiting for them.  When Nurse Veavea failed to provide any response, Officer Gillis acted reasonably in assuming that there was no immediate emergency and then continuing to process the Futi Party.  In other words, Nurse Veavea's silence suggested that there was no emergency requiring Officer Gillis to take any affirmative steps to assist the Futi Party in getting to Kapiolani or another hospital.  Indeed, the Futi Party had safely traveled several hours by plane and did not request plane-side screening.  Further, Michael was not displaying any signs of distress while he was at primary inspection and Nurse Veavea provided no further information regarding the "emergency appointment."  Nurse Veavea herself apparently did not believe Michael was in any danger because she did not check his pulse or oxygen level at any time after

49

they left the plane.  Accordingly, the court finds that Officer Gillis acted

reasonably and prudently in continuing to process the Futi Party through customs.

123.   Mrs. Futi's production of the medical waiver form during

primary processing does not change the reasonableness of Officer Gillis' actions.

The medical waiver form did not suggest that Michael was in the midst of a

medical emergency.

124.   To the extent the discretionary function exception does not

apply to Officer Gillis' failure to inform the Futi Party that Michael could leave

with Nurse Veavea (while Mrs. Futi went through secondary screening), such

failure does not breach any duty to Plaintiffs.  Directive 3340-030A provides that

the "specific circumstances" facing the CBP officer dictate whether a minor should

be separated from a parent who is being detained.  *See* JSE 1 at § 8.5.  Under the

circumstances described above, it was not unreasonable for Officer Gillis to

determine that the Futi Party should stay together rather than separate a newborn

baby from his mother.

125.   As for the secondary processing, the court finds that SCBPO

Gillis breached his duty to Plaintiffs by failing to ask the Futi Party whether they

needed medical treatment before placing them in the secondary processing room.

SCBPO Gillis had a duty to inquire given that he could plainly see that Nurse

50

Veavea was a nurse traveling with a patient and a reasonable SCBPO official would have asked Nurse Veavea about her patient to determine whether being locked in an unattended room posed any danger to Michael.  Directive 3340-030A also imposed a duty on SCBPO Gillis, requiring that "[a]ll persons placed in an unattended secured area at a CBP facility will be asked whether they have a medical problem or condition which may require some attention."  JSE Ex. 1, § 9.4.1.  Under these circumstances, SCBPO Gillis should have asked whether anyone in the Futi Party needed medical treatment.[10]

126.   The court further finds that if SCBPO Gillis had asked Nurse Veavea whether anyone in the Futi Party needed medical treatment, Nurse Veavea more likely than not would have told SCBPO Gillis about Michael's heart murmur and their need to get to Kapiolani for his medical appointment.  SCBPO Gillis testified that if he was told that Michael needed to get urgently and quickly to the hospital, "they would have been gone," and that secondary processing would not stand in the way of Michael receiving health care.  Pls.' Ex. K, SCBPO Gillis

---

[10]  Because the court finds that SCBPO Gillis was negligent in failing to ask Nurse Veavea whether anyone in her party needed medical attention, the court need not determine whether he was negligent in failing to answer her question of how long processing would take, or whether Officer Gillis was negligent in failing to tell SCBPO Gillis that Nurse Veavea had mentioned an "emergency appointment" at Kapiolani.  A finding of negligence for these latter acts would not change the causation analysis because all of these events occurred in the same approximate time period.

Depo. at 70:15-71:4.  Accordingly, the court finds that had SCBPO Gillis fulfilled

his duty to the Futi Party by inquiring regarding whether anyone needed medical

treatment, he would have allowed the Futi Party to proceed without completing

secondary screening at that time.  In other words, SCBPO Gillis would have

allowed the Futi Party to leave the customs area at approximately 5:55 a.m.  *See*

JSF ¶ 51.

   127. By finding that SCBPO Gillis breached his duty to the Futi

Party, the court must now determine whether this breach is the legal cause of any

harm to Michael.  "An actor's negligent conduct is a legal cause of harm to another

if (a) his or her conduct is a substantial factor in bringing about the harm, and (b)

there is no rule of law relieving the actor from liability because of the manner in

which his or her negligence has resulted in the harm."  *Panion v. United States*,

385 F. Supp. 2d 1071, 1090 (D. Haw. 2005) (quoting *Doe Parents No. 1 v. State of

Hawaii*, 100 Haw. 34, 85, 58 P.3d 545, 596 (2002)); *see also Taylor-Rice v. State

of Hawaii*, 91 Haw. 60, 69-70, 979 P.2d 1086, 1095-96 (1999).  The first inquiry in

this test "contemplates a factual determination that the negligence of the defendant

was more likely than not a substantial factor in bringing about the result

complained of."  *Panion*, 385 F. Supp. at 1090 (quoting *Taylor-Rice*, 91 Haw. at

74, 979 P.2d at 1100).  In other words, "a defendant's negligence need not have

been the whole cause or the only factor in bringing about the harm.  It was enough

that his or her negligence was a substantial factor in causing plaintiff's injuries."

*Id*. (quoting *Taylor-Rice*, 91 Haw. at 74, 979 P.2d at 1100).

128.   Despite SCBPO Gillis' breach of his duty to the Futi Party, the

court finds that Plaintiffs have failed to carry their burden of establishing by a

preponderance of the evidence that this breach was a substantial factor in causing

Michael's death.  Stated differently, Plaintiffs have failed to establish by a

preponderance of the evidence that had SCBPO Gillis allowed the Futi Party to

leave customs at 5:55 a.m., they would have arrived at Kapioliani and received

either the necessary supplemental oxygen or Naloxone in time to prevent

Michael's death.

129.   In getting from customs to Kapiolani, every minute mattered --

Michael turned blue and was gasping at 6:06 a.m., Nurse Veave could not detect a

pulse and did not believe he was breathing at 6:07 a.m., and his pulse stopped at

6:12 a.m.  Before getting medical assistance at Kapiolani, the Futi Party at a

minimum needed to proceed from customs and through the baggage claim area,

locate their potential rides -- either Nofoa who had parked her car less than three

minutes away and was waiting in the baggage claim area, or Matai who was

circling the airport in her car -- get into the vehicle, drive from the airport to

Kapiolani, and then seek medical assistance at Kapiolani.[11]  Each of these steps would necessarily take valuable minutes and/or seconds, but Plaintiffs do not take all of these steps into account and otherwise do not prove by a preponderance of the evidence how long it would have taken for Michael to receive medical assistance.

130.   Specifically, Plaintiffs argue that had CBP released the Futi Party at 5:55 a.m., they would have been in Nofoa's car before 5:58 a.m. because she was parked less than three minutes away, and then reached Kapiolani by 6:08 a.m.  *See* Pls.' Br. on Causation 2-3.  In proffering this time line, Plaintiffs account for only the time to walk from baggage claim to Nofoa's car and the drive to Kapiolani.  Even if Mrs. Futi did not retrieve her luggage, Plaintiffs do not account for the first steps of getting from customs through the baggage claim area, finding either Nofoa or Matai, and getting into the vehicle.  Further, if the court accepts Plaintiffs' assumption that the Futi Party would have received a ride from Nofoa,

---

[11]  Further, Mrs. Futi checked in one piece of luggage, and the luggage did not begin to arrive on the baggage carousel until 5:58 a.m.  Plaintiffs have presented no evidence suggesting that the Futi Party would have either left the luggage at the airport or that Nurse Veavea and Michael would have left Mrs. Futi to wait for her luggage while they proceeded to Kapiolani. While the court recognizes that Michael did have this heart condition and was traveling to Hawaii specifically for treatment, this evidence on its own does not establish that Michael and/or the Futi Party would have left the airport before Mrs. Futi picked up her luggage.  Up until 6:06 a.m., Michael did not display any signs of medical distress and Nurse Veavea showed no concern for Michael's immediate health -- she failed to check his vital signs throughout processing despite doctors' orders to check them every 15 minutes.

Nofoa had parked her car such that additional time would have been taken paying for parking and leaveing the parking area.  By taking into account only the time it would have taken to walk to Nofoa's car and ignoring these other steps, Plaintiff's proposed departure time from the airport of 5:58 a.m. is neither reliable nor realistic.

131.   Nor have Plaintiffs proven by a preponderance of the evidence that the Futi Party's drive from the airport to Kapiolani on this day would have taken only ten minutes.  To support their contention that the drive would have taken only ten minutes, Plaintiffs rely upon two letters from their private investigator, Matthew Levi, who drove the route from Honolulu Airport to Kapiolani on three separate weekday mornings -- January 27, 2009 at 5:38 a.m., May 8, 2009 at 5:50 a.m., and May 15, 2009 at 5:50 a.m.  Mr. Levi arrived at Kapiolani in ten minutes twenty-seven seconds, nine minutes fifty-three seconds, and nine minutes forty-two seconds respectively.  Pls.' Ex. R.  The United States objects to this evidence as irrelevant to the issue of long it would have taken the Futi Party to drive to Kapiolani on February 8, 2008.  *See* Doc. No. 100, Obj. No. 6.  The court agrees in part.

132.   Experiments recreating events may be relevant and therefore admissible so long as they are "substantially similar" to the event in question.  *See*

*United States v. Jackson*, 479 F.3d 485, 489 (7th Cir. 2007) (citing *Mihailovich v. Laatsch*, 359 F.3d 892, 908 (7th Cir. 2004)); *see also Hinkle v. City of Clarksburg*, 81 F.3d 416, 425 (4th Cir. 1996) (stating the "requirement that video taped evidence purporting to recreate events at issue must be substantially similar to the actual events to be admissible"); *Persian Galleries, Inc. v. Transcontinental Ins. Co.*, 38 F.3d 253, 258 (6th Cir. 1994) ("The admissibility of experimental evidence depends upon its relevance and probativity.  Experimental evidence is probative if the conditions of the experiment were identical with or similar to the conditions of the transaction in litigation." (quotations omitted)); *Vigilant Ins. v. Sunbeam Corp.*, 231 F.R.D. 582, 594 (D. Ariz. 2005).  "'Substantially similar' does not mean 'identical,'" and "as a general matter, 'dissimilarities between experimental and actual conditions affect the weight, not the admissibility of the evidence.'" *Jackson*, 479 F.3d at 489 (citations omitted).  Where the purpose of the experiment is to recreate the event, however, "courts will only admit evidence of experiments that are conducted under nearly identical conditions as the actual event." *Id.*

133.   Applying these principles, evidence regarding how long it took Mr. Levi to drive from the airport to Kapiolani on three separate mornings is relevant to the extent this evidence suggests that the drive on some mornings may take approximately ten minutes.  This evidence is also relevant to the extent Mr.

56

Levi provides that the distance between the Honolulu Airport and Kapiolani is approximately seven miles.  *See* Pls.' Ex. R.  This evidence is not probative, however, of how long it would have taken the Futi Party to drive to Kapiolani on February 8, 2008 because there are too many unknowns and dissimilarities between the proffered evidence and the drive the Futi Party would have taken on February 8, 2008.  The lack of similarities include, for example, that (1) even according to Plaintiffs, the earliest the Futi Party could have left the airport was 5:58, but Mr. Levi made the drive once at 5:38 a.m. and twice at 5:50 a.m.; (2) it was raining on February 8, 2008, but the weather conditions when Mr. Levi drove are unknown; (3) the traffic conditions when Mr. Levi drove are unknown; and (4) it was still dark on February 8, 2008 during the time that the Futi Party would have been driving, *see* JSEs 30-32, but the sun was rising for Mr. Levi's drives on May 8 and 15, 2009.[12]  *See* Sunrise and Sunset for U.S.A. - Hawaii - Honolulu - May 2009, *at* http://www.timeanddate.com/worldclock/astronomy.html?n=103

---

[12]  The court may take judicial notice of the time of sunrise for a particular day.  *See Shahar v. Bowers*, 120 F.3d 211, 214 (11th Cir. 1997); *Davis v. Freels*, 583 F.2d 337, 339 n.2 (7th Cir. 1978); *McCollum v. Bahl*, --- F. Supp. 2d ----, 2010 WL 1813475, at *13 n.5 (W.D. Mich. May 3, 2010).

&month=5&year=2009&obj=sun&afl=-11&day=1 (last visited July 21, 2010) (providing sunrise times for May 2009 in Honolulu).[13]  In sum, Plaintiffs have not proven that Mr. Levi's drives were substantially similar to what the Futi Party would have faced in driving to Kapiolani on February 8, 2008.

134.   While the drive from the airport to Kapiolani may take only ten minutes on some days and there was little traffic on February 8, 2008 at two points -- Middle Street and Punahou Street -- it was nevertheless dark and raining during this time frame such that it is mere speculation that the drive would have taken only ten minutes (and not eleven, twelve, or more minutes) on February 8, 2008. Accordingly, Plaintiffs have failed to establish by a preponderance of the evidence that the Futi Party's drive from Honolulu Airport to Kapiolani would have taken only ten minutes.

135.   Finally, Plaintiffs have not taken into account the time required for the Futi Party to exit their vehicle and seek medical assistance at Kapiolani. While assistance at Kapiolani would certainly have been given quickly, it would not be instantaneous and consideration of the time for this step is necessary.  As such, Plaintiffs have failed to establish by a preponderance of the evidence that

---

[13]  The court files separately the captures of all websites cited herein.

Michael would have received medical attention within thirteen minutes of leaving customs at 5:55 a.m.

136.   This dissection above of the time and steps necessary for the Futi Party to travel from customs to Kapiolani to receive medical assistance shows that each step consumed valuable time -- minutes and even seconds -- which Plaintiffs did not consider in suggesting that the Futi Party would have arrived at Kapiolani by 6:08 a.m.  Accordingly, the court finds that Plaintiffs have not proven by a preponderance of the evidence that the Futi Party would have received medical assistance at Kapiolani by 6:08 a.m.  Taking into account all of the necessary steps before the Futi Party would have arrived at Kapiolani and Michael received medical assistance, the court finds that the Futi Party would have arrived at Kapiolani some time after 6:08 a.m., but cannot determine whether they would have received medical assistance as early as 6:09 a.m. or as late as 6:15 a.m. or later.  Given that Michael's medical emergency began at 6:06 a.m. and his pulse stopped at 6:12 a.m., the court finds that Plaintiffs have failed to prove by a preponderance of the evidence that Michael would have survived had SCBPO Gillis not breached his duty to the Futi Party.  In other words, Plaintiffs have failed to establish that SCBPO Gillis' failure to release the Futi Party from customs was a substantial factor in Michael's death.

59

137.   Further, even if Plaintiffs did prove their timeline by a preponderance of the evidence (which this court does not find), the court finds that Plaintiffs still have not carried their burden that Michael could have survived if he reached Kapiolani by 6:08 a.m., approximately two minutes after Nurse Veavea first noticed that Michael had turned unusually blue and was gasping for breath, and one minute after Nurse Veavea could not detect a pulse and believed that he had stopped breathing.  Specifically, Plaintiffs have presented no evidence that Michael could have survived had he reached Kapiolani after the onset of his medical emergency.  Rather, the only evidence presented is that if Michael was administered oxygen prior to or at the onset of his medical emergency -- *i.e.*, 6:06 a.m. -- he probably would have survived.  Dr. Lamberti testified as follows:

> Q:   Doctor, is it your opinion to a reasonable medical probability that had this child been given oxygen prior to his coding that he would have survived?
> A:   I think it would be the appropriate thing to do, yes.
> Q:   Okay.  And that he would have survived?
> A:   It would have increased the likelihood, sure.
> Q:   Okay.
> A:   I think it -- in my opinion, the cause was pulmonary vasospasm, and oxygen should have reversed it.
> Q:   So it's probable that had he been given oxygen before he coded, he would have survived.  Is that correct?
> A:   Yeah, he had a very good chance of surviving.
> Q:   Probable more --
> A:   Probable.

60

Q:     -- likely than not?
A:     Probable, right.
Q:     Those are --
A:     Once he --
Q:     medical/legal words.
A:     -- started to get sick, you give him oxygen, and he
       should get better.

JSE 67, Lamberti Depo. at 99:4-100:1.

138.    While Dr. Lamberti testified that once Michael "started to get

sick" oxygen would have made him "better," Dr. Lamberti provides no opinion

regarding how long into Michael's medical emergency that oxygen would still

work to revive him.  Michael's condition deteriorated quickly after Nurse Veavea

noticed that he had turned unusually blue was having trouble breathing at 6:06 a.m.

Within that same minute, Nurse Veavea checked his vital signs, saw that his pulse

rate and oxygen saturation rate had fallen significantly, and began CPR.  After a

one-minute cycle of CPR, Nurse Veavea could not detect Michael's pulse and he

was no longer breathing.  At 6:12 a.m., Michael's hand, which had curled onto

CDR Walker's hand, released and CDR Walker could find no pulse. Under these

facts, Plaintiff's assertion that supplemental oxygen administered at 6:08 a.m.

would have revived Michael is simply speculation and not supported by any expert

opinion.  Accordingly, Plaintiffs have not carried their burden on proving by a

preponderance of the evidence that Michael could have survived even if they

arrived at Kapiolani by 6:08 a.m.

139.   In opposition, Plaintiffs argue that the term "code" as used in

Dr. Lamberti's testimony means when a patient "loses vital signs."  *See* Pls.' Reply

on Causation at 3.  Plaintiffs posit that based on this definition, Dr. Lamberti's

testimony that Michael would have had a very good chance of surviving had he

received supplemental oxygen before he "coded" means that Michael had a good

chance of survival until 6:12 a.m., when the parties stipulate his pulse stopped.

The court rejects Plaintiff's proffered definition of the term "code" as unsupported

by any evidence.

140.   The only evidentiary support Plaintiffs cite for their definition

of "code" is that counsel for the United States used this definition during Nurse

Veavea's deposition testimony.  *Id.*  Contrary to Plaintiffs' assertion, however, it

was Plaintiffs' counsel who used this definition in a question to Nurse Veavea, and

Nurse Veavea neither commented on nor was asked about the accuracy of

Plaintiffs' counsel's definition.  *See* Pls.' Ex. G, Veavea Depo. at 116:11-18.[14]

---

[14]  The exchange between counsel for Plaintiffs and Nurse Veavea was as follows:

> Q:   And are these the drugs, like, if someone in the hospital
>       loses vital signs they -- what they call a code, something
>       like that?  I'm sorry, let me start the question again.
>           The -- what did you, what did you just call the

(continued...)

Setting aside Plaintiffs' mischaracterization of the evidence, Plaintiffs present no evidence to support their position that "code" refers to losing vital signs.  Rather, the only evidence presented is that if Michael was given oxygen "once he started to get sick," that he "should get better."  *See* JSE 67, Lamberti Depo. at 99:4-100:1. Michael clearly started "to get sick" at 6:06 a.m.  Accordingly, Plaintiffs have not shown by a preponderance of the evidence that Michael could have survived if he had been provided oxygen at 6:08 a.m.

141.   Further, even if the court on its own considers the definition of "code," the court finds no support for Plaintiffs' proffered definition.  As defined in dictionaries, a "code" in medical terms is "a directive or alert to a hospital team assigned to emergency resuscitation of patients."  *See* Define Code at Dictionary.com, *at* http://dictionary.reference.com/browse/code (last visited July 21, 2010) (defining the noun "code"); *see also* Code - Definition and More from Merriam-Webster's Free Medical Dictionary, *at* http://www.merriam-webster.com/medical/code (last visited July 21, 2010) (defining the verb "code" as "to experience cardiac arrest or respiratory failure"); Code, hospital definition - Medical Dictionary, *at* http://www.medterms.com/

---

[14](...continued)
                          drugs, what kind of drugs are they called?
          A:     They're first--line emergency drugs.
Pls.' Ex. G, Veavea Depo. at 116:11-18.

script/main/art.asp?articlekey=59951 (last visited July 21, 2010) (explaining that "[w]hile there is no formal definition for a 'Code,' doctors often use the term as slang to refer to a patient in cardiopulmonary arrest, requiring a team of providers (sometimes called a 'code team') to rush to the specific location and begin immediate resuscitative efforts").  This definition of "code" is supported by Dr. Lamberti's own testimony -- Dr. Lamberti explained that once Michael started to get sick, oxygen would make him better.  JSE 67, Lamberti Depo. at 99:4-1000:1.  In sum, the court rejects Plaintiffs' argument that the evidence supports that had Michael received oxygen at any time between 6:06 a.m. and 6:12 a.m. that he more likely than not would have survived.

142.   Plaintiffs also argue that the court should apply the lost chance doctrine to allow recovery under these facts.  In general, the lost chance doctrine lowers a plaintiff's burden of proof in cases where the plaintiff was deprived of a less than a fifty percent chance to avoid injury.  *See* Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 26 (stating that the doctrine allows recovery when a physician's negligence deprives plaintiff of a chance of recovery); *see also Matsuyama v. Birnbaum*, 890 N.E.2d 819, 829 (Mass. 2008) (same); *McKellips v. Saint Francis Hosp. Inc.*, 741 P.2d 467, 471 (Okla. 1987) ("An evolving trend has developed to relax the standard for sufficiency of proof of

causation ordinarily required of a plaintiff to provide a basis upon which the jury

may consider causation in the 'lost chance of survival' cases.").

143.   Some courts have limited the application of this doctrine to

medical malpractice cases, while other courts have expanded it to other areas.

*Compare Hardy v. Sw. Bell Tel. Co.*, 910 P.2d 1024, 1029 (Okla. 1996) (limiting

the lost chance doctrine to medical malpractice claims), *and Matsuyama*, 890

N.E.2d at 823 ("Permitting recovery for loss of chance is particularly appropriate

in the area of medical negligence.  Our decision today is limited to such claims."),

*with Bishop v. Gainer*, 272 F.3d 1009, 1016 (7th Cir. 2001) (expanding the lost

chance doctrine to employment discrimination claim), *and Alexander v. City of

Milwaukee*, 474 F.3d 437, 449 (7th Cir. 2007) (same).  Although the Hawaii

Supreme Court has not yet addressed this doctrine, much less determined its

applicability beyond medical malpractice cases, the Ninth Circuit interpreted

Hawaii law as allowing the lost chance doctrine to apply to medical malpractice

claims.  *See McBride v. United States*, 462 F.2d 72 (9th Cir. 1972); *see also*

Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 26

(stating that *McBride* applied the lost chance doctrine to Hawaii law).  In sum, it is

unclear whether the Hawaii Supreme Court would actually recognize the lost

chance doctrine, much less whether it would extend the doctrine outside the medical malpractice context.

144.   The court need not resolve whether the Hawaii Supreme Court would recognize the lost chance doctrine, however, because Plaintiffs have not carried their burden under any formulation of the doctrine.  Specifically, the lost chance doctrine applies where the defendant's negligent acts interfered with a decedent's chance of survival.  *See, e.g.*, *McBride*, 462 F.2d at 75 (finding that negligent failure to provide treatment provides a cause of action if it "deprives a patient of a significant improvement in his chances for recovery"); *see also Matsuyama*, 890 N.E.2d at 832 ("[A] plaintiff must still prove by a preponderance of evidence, or more likely than not, that the defendant's actions reduced her chance of a better outcome." (citing Joseph H. King Jr., "Reduction of Likelihood Reformulation and Other Retrofitting of the Loss-of-a-Chance Doctrine, 28 U. Memphis L. Rev. 491, 492 (1998)); *Smith v. Louisiana*, 676 So.2d 543, 547 (La. 1996) ("[T]he plaintiff must prove by a preponderance of the evidence that the tort victim had a chance of survival at the time of the professional negligence.").

145.   Assuming that the Hawaii Supreme Court would apply some form of the lost chance doctrine, Plaintiffs have failed to come forward with any evidence suggesting that Michael had a *chance* of survival had SCBPO Gillis

allowed the Futi Party to leave customs at 5:55 a.m.  As described above in detail, Plaintiffs have failed to establish by a preponderance of the evidence the time that Michael would have arrived at Kapiolani and received medical assistance.  Without establishing the time that Michael would have arrived at Kapiolani, the court cannot determine whether Michael would have survived, much less whether he would have had a chance of survival.  Further, even accepting Plaintiffs' timeline, Plaintiffs have presented no evidence that had Michael arrived at Kapiolani by 6:08 a.m., he had any chance of survival.  Specifically, no doctors and/or experts provide any opinion which allows the court to go beyond speculation in determining Michael's chances of survival at 6:08 a.m.  Accordingly, Plaintiffs have failed to establish that the loss of chance doctrine should apply to these facts.

146.   In sum, the court concludes that Plaintiffs have not established actionable negligence on the part of the United States.  As such, no discussion of damages is warranted or necessary.

# V.  <u>CONCLUSION</u>

Based on the Findings and Conclusions, the court orders that

Judgment shall enter in favor of the United States on all claims.

The Clerk of Court is directed to close the case.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, July 22, 2010.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*Futi v. United States*, Civ. No. 08-00403 JMS/LEK Findings of Fact and Conclusions of Law